IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>ANTONIO K. GREEN,<br><br>      Defendant. | Case No. 3:24-CR-30146-NJR-1 |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Defendant Antonio K. Green was charged with being a felon in possession of a firearm after police found a gun in his car. He now moves to suppress the evidence of this crime because the police stopped him on the basis of an anonymous 911 call, which, in his view, was not sufficiently reliable to justify the stop. (Doc. 48). Green's motion is fully briefed and ripe for disposition without a hearing.[1]

### BACKGROUND

On August 1, 2024, the East St. Louis Police Department received a 911 call from an unidentified caller requesting police assistance at a Mobil gas station at 8301 State Street in East St. Louis, Illinois. (Exh. 1 of Gov. Brief (Doc. 55), 911 Call Rec. 00:04-00:24).

---

[1] Although Green requested an evidentiary hearing to "resolve disputed facts," he has not identified the disputed facts, nor explained why their resolution is necessary to resolve the motion. The factual record is well developed. It includes the 911 call, the arresting officer's body camera footage, which captures Green's encounter with police, and relevant documentary evidence. Thus, considering the lack of an identified factual dispute and the robust evidentiary record available, the Court declines to hold an evidentiary hearing. *See United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) ("Evidentiary hearings are necessary only when the party requesting the hearing identifies a significant, disputed factual issue that must be resolved."); *accord United States v. McGauhy*, 485 F.3d 965, 969 (7th Cir. 2007).

The caller was "watching the camera" and reported "somebody walking around the parking lot holding a pistol . . . threatening [inaudible]." (*Id.* 00:29-00:34, 00:41). Although the caller could "barely see" the suspect, he described him as "African American" and "an old man." (*Id.* 00:41-00:58). He further stated that the suspect was wearing "jeans" and a "beige shirt." (*Id.* 00:45-00:48). Towards the end of the one minute and 37 second call, the caller stated that "he's been threatening customers. I just don't know what's going on with him." (*Id.* 01:23-01:26).

Officer Dennis Hill was dispatched to the Mobil gas station at approximately 7:27 p.m. (Exh. B. of Def. Brief (Doc. 48-1, p. 6), Police Report). The computer-aided dispatch ("CAD") notes indicated that a Black man wearing a "beige shirt" was "walking around the lot with a handgun." (Exh. C. of Def. Brief (Doc. 48-2, p. 1), CAD Notes). The CAD notes also relayed that the "subject was making threats to customers." (*Id.*).

Officer Hill arrived at the Mobil gas station at around 7:38 p.m. (*Id.*). He stepped out of his cruiser and "observed a black male later identified as offender Antonio Green to be entering the driver's seat of a white in color, 2006 Cadillac CTS." (Doc. 48-1, p. 6). Officer Hill identified Green as the subject of the 911 call because he was wearing a beige shirt and blue jeans, consistent with the anonymous caller's description. (*Id.*).

Officer Hill's body camera footage begins at 7:39 p.m. (Exh. A of Def. Brief (Doc. 49), Body Camera Footage). At that time, he got back into his cruiser and pulled in front of Green's car to block him from leaving the parking lot. (*Id.* 0:00:05-25). At the same time, Officer Barnett parked his cruiser behind Green's car. (*Id.*). Officer Hill approached the passenger side window of Green's car with his service weapon drawn and asked

Green if he had any weapons "on [him]." (*Id.* 0:00:05-25). Although the body camera footage reveals an inaudible response from Green to this question, Officer Hill noted in his police report that Green replied "Yes." (*Id.* 0:00:28-35; Doc. 48-1, p. 6).

Officer Hill ordered Green out of the car and asked him where he kept his firearm. (Doc. 49, 0:00:33, 0:01:20). Green told him that it was "on the seat" and admitted that he did not have a Firearm Owner's Identification ("FOID") card or a Concealed Carry Weapon ("CCW") card.[2] (*Id.* 0:01:22-29). Officer Hill told Green that he was "just detained" at this point and had another officer place him in the back of a police cruiser. (*Id.* 0:01:28).

Officer Hill then went into the gas station to find the person who called 911. (*Id.* 0:02:23-38). He spoke to two people, but none appeared to know who made the call. (*Id.*). When Officer Hill came back out into the parking lot, another officer was speaking to a witness (K.A.) who told him that "he [presumably Green] was trying to get that girl over there in the white." (*Id.* 0:02:55-58). When he heard this, Officer Hill told his colleague "I got probable cause now." (*Id.* 0:02:58). K.A. told Officer Hill that Green had a black gun and was "walking around with it . . . in his hand." (*Id.* 0:03:10-34). K.A. also said that Green pulled the gun on another person and "freaked out." (*Id.* 0:04:11-15). After speaking with K.A., Officer Hill searched Green's car and found the gun near the driver's seat. (*Id.* 0:05:07-06:23).

---

[2] Under Illinois law, subject to certain exceptions not relevant here, "[n]o person may acquire or possess any firearm, stun gun, or taser within this State without having in his or her possession a Firearm Owner's Identification Card previously issued in his or her name by the Illinois State Police." 430 ILCS 65/2(a)(1).

On November 5, 2024, Green was indicted on one count of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). (Doc. 1). He now moves to suppress the evidence and statements derived from his encounter with police.

## DISCUSSION

The Fourth Amendment to the U.S. Constitution protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "Stopping someone is generally considered a seizure for which probable cause is required." *United States v. Olson*, 41 F.4th 792, 799 (7th Cir. 2022). This general rule, however, is subject to a "limited exception" for "brief investigatory stops" (known as "*Terry* stops") where an officer has a reasonable suspicion of criminal activity. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "Whether reasonable suspicion of criminal activity justified a *Terry* stop is a fact-intensive, objective inquiry encompassing the totality of the circumstances known to the officers at the moment of seizure." *Id.* at 800. Although this is a lower standard than probable cause (which is necessary for a full-blown arrest), it is not met simply because an officer has a "hunch" that criminal activity might be afoot. *United States v. Lopez*, 907 F.3d 472, 478 (7th Cir. 2018). "Whether the facts were enough to support reasonable suspicion [as opposed to a mere "hunch"] 'is dependent upon both the content of the information possessed by police and its degree of reliability.'" *United States v. Swinney*, 28 F.4th 864, 866 (7th Cit. 2022) (quoting *United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019)).

Green argues that Officer Hill subjected him to a *Terry* stop without possessing a reasonable suspicion of criminal activity. Both parties agree that Green was seized when

Officers Hill and Barnett parked their cruisers in front of and behind his car so that he could not drive away. The government argues, however, that the seizure was supported by a reasonable suspicion of criminal activity. And because the initial seizure was justified, the events that followed, including Green's admission about an unlicensed gun in the car, justified the search that revealed the gun. But if Green is correct that Officer Hill lacked reasonable suspicion to stop him in the first place, then any subsequent developments (including his statements to police) are irrelevant, and the evidence is subject to suppression. *See United States v. Williams*, 731 F.3d 678, 685-87 (7th Cir. 2013) (each investigatory step must be supported by requisite level of suspicion or cause). The dispositive question, then, is whether Officer Hill had a reasonable suspicion of criminal activity when he initiated a *Terry* stop by blocking Green's car from driving away.

Officer Hill's suspicion was based on the information he received about the anonymous 911 call, which reported a Black man in a beige shirt "threatening" people with a gun. Anonymous tips to police are viewed with some skepticism under the Fourth Amendment because, by their nature, they do not identify the informant and "seldom demonstrate[] the informant's basis of knowledge or veracity." *Alabama v. White*, 496 U.S. 325, 329 (1990). Anonymous tips must therefore be scrutinized for their reliability to make sure police do not intrusively investigate innocent citizens whom an informant seeks to falsely accuse. *Florida v. J.L.*, 529 U.S. 266, 272 (2000). Of course, "[t]his is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a *Terry* stop." *White*, 496 U.S. at 329. "[T]here are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to

make the investigatory stop." *J.L.*, 529 U.S. at 270 (internal quotation marks omitted). Reliability thus exists on a spectrum: the more indicia of reliability a tip presents, the more likely it is to support a *Terry* stop. *Id.*; *White*, 496 U.S. at 329; *accord Navarette v. California*, 572 U.S. 393, 397, 401 (2014).

The Seventh Circuit has identified three factors, based on the Supreme Court's decision in *Navarette v. California*, "that make an anonymous tip reliable enough to create reasonable suspicion: the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing." *United States v. Watson*, 900 F.3d 892, 895 (7th Cir. 2018) (citing *Navarette*, 572 U.S. at 399-401) (the *Navarette* factors or framework). Moreover, the anonymous tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272.

Green argues that the anonymous 911 call was not sufficiently reliable to support reasonable suspicion because it described him in overly generic terms: a Black man with a gun, wearing a beige shirt and jeans.³ He is correct that these generic descriptors *alone* do not support a *Terry* stop. It is not illegal in Illinois to possess a gun with a license, nor is it a crime to wear a beige shirt and jeans. But Green's argument omits critical information about the 911 call that demonstrates its reliability and assertion of illegality.

Reliability, as noted, must be assessed under the *Navarette* framework. The first *Navarette* factor concerns the caller's "eyewitness knowledge" of the events in question.

---

³ Although the 911 caller described the suspect as wearing a beige shirt and jeans, the CAD notes only mentioned the beige shirt.

Eyewitness knowledge "lends significant support to the tip's reliability" because it necessarily implies that the caller knows that dangerous or illegal activity was or is taking place. *Navarette*, 572 U.S. at 399. Here, the 911 caller told police that he was "watching the camera" and saw "somebody walking around the parking lot holding a pistol . . . threatening" people. He thus asserted eyewitness knowledge of the events. Although he qualified his observations by telling police he could "barely see" the suspect, he still was able to describe him as "African American" and "an old man." He also saw enough to tell police that the suspect was wearing "jeans" and a "beige shirt." It is thus apparent that, even with limitations in what the caller could see, he asserted eyewitness knowledge of Green's threatening behavior. This supports the reliability of the call under the first *Navarette* factor.

The second *Navarette* factor determines whether the caller reported information "contemporaneously with the event." Contemporaneous reports are viewed as reliable because the reporting party does not have the luxury of time and deliberation to fabricate a story. *Id.* at 399-400. This factor, too, weighs in favor of reliability. The caller reported the events as they unfolded. He was "watching the camera" and relayed the information in real time or very shortly after he saw the suspect threaten people. The contemporaneity of this report supports its reliability.

The third *Navarette* factor also weighs in favor of reliability. When an anonymous caller uses the 911 system, her report is considered reliable because the police can trace the call back to her. *Id.* at 400-01. The likelihood of identification means that "a false tipster would think twice before using such a system." *Id.* at 401. Here, there is no dispute that

the anonymous call came in through the 911 emergency system.[4] Thus, on the surface, the 911 call bears the indicia of reliability normally attributed to such calls under the *Navarette* framework.

But the analysis of the third *Navarette* factor cannot end there because the caller never told police whether he was calling from a personal phone or some else's. In *Watson*, an anonymous caller borrowed another person's phone to call 911 and reported "boys" "playing with guns and stuff." *Watson*, 900 F.3d at 893. The Seventh Circuit determined that, under these circumstances, the call could not support reliability in the way other 911 calls do. *Id.* at 895. This was so because the caller had no connection to the owner of the phone. *Id.* "Any phone number identified would not lead back to the caller because he had no permanent connection to the phone, and the phone's geographic location at the time of the call would be useful only so long as the caller remained near the phone." *Id.* Here, the anonymous caller presumably called from inside the Mobil gas station because he told police he was "watching the camera." This puts him in a similar position to the caller in *Watson* who relayed his observations from across the street. *Id.* at 893. What is less clear is whether the caller used his own phone or someone else's. If it is the latter, the third *Navarette* factor likely undermines the tip's reliability as it did in *Watson*.

But the anonymous 911 call here does not flunk the third *Navarette* factor, and

---

[4] Green apparently did not receive a recording of the 911 call until after he filed his motion to suppress. He thus argued in his motion that the call lacked reliability because it was not clear whether it was made through the 911 system. Although the government's delayed disclosure forced him to pivot from this argument, he ably argued in his reply brief that the call was not reliable, regardless of the caller's use of the 911 system. In any event, because Green does not dispute that the anonymous caller used the 911 system, the existence of the 911 call is established.

certainly not the broader reliability analysis, based on the *possibility* that the caller used someone else's phone. What *might* have happened here, definitively happened in *Watson*: the police *knew* that that the caller was using someone else's phone. The possibility that this might have happened here too does not upend the reliability analysis because "the fact that the police knew the caller had used the 911 system supports a finding of reasonable suspicion." *Swinney*, 28 F.4th at 867 n.3. Moreover, because "there is nothing to suggest that the caller did not believe h[is] phone number would be known to police," the police reasonably relied on the veracity of the report.[5] *Id.* Accordingly, the evidence supports a finding of reliability under third *Navarette* factor.

The content of the report was also clear in its "assertion of illegality." *J.L.*, 529 U.S. at 272. The caller told police that the suspect was walking around the parking lot "threatening customers" with a gun. In Illinois, a person commits an aggravated assault when he "places another in reasonable apprehension of receiving a battery," and does so with a deadly weapon. 720 ILCS 5/12-1(a) & 2(c)(1) (defining assault and aggravated assault). A report that a person is "threatening" others with a gun, reasonably may be construed as a report of an aggravated assault. This assertion of illegality sets this case apart from *Watson*, where the report of "boys" "playing with guns and stuff," showed only a "mere possibility of unlawful use" of a firearm. *Watson*, 900 F.3d at 893, 896 (quotation marks omitted). "[T]he presence of guns did not create a reasonable suspicion

---

[5] At one point during the encounter, the dispatcher appears to tell Officer Hill that "it was an employee" who made the 911 call. (Exh. A of Def. Brief (Doc. 49), Body Camera Footage 0:01:55-0:02:04). The remaining footage neither confirms nor refutes this claim. Officer Hill spoke to two people inside the gas station, but neither appeared to know who made the call.

of an ongoing crime, because carrying a firearm in public is permitted with a license in Indiana." *Id.* at 895. Contrast this with the report here: a person "threatening" others with a gun. Such conduct is not permitted in Illinois, with or without a license. The clear assertion of illegality, coupled with the satisfaction of the *Navarette* factors, pushes this anonymous tip towards the reliable end of the spectrum, where tips supporting reasonable suspicion are gathered.

Green, for his part, relies on *J.L.* for the proposition that "an anonymous tip about a person with a gun, absent additional facts, cannot suffice as reasonable suspicion." (Def. Br., p. 9 (Doc. 48)). In *J.L.*, an anonymous caller reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *J.L.*, 529 U.S. at 268. When officers responded, they saw three Black males "just hanging out there" *Id.* (alteration omitted). Although one of the three, J.L., was wearing a plaid shirt, the officers had no reason to suspect him or the other two males of illegal conduct apart from the anonymous tip. *Id.* The officers nevertheless stopped and frisked J.L. and found a gun in his pocket. *Id.* The Court held that the officers acted without reasonable suspicion of criminal activity because the anonymous tip was neither reliable nor did it allege illegal conduct. *Id.* at 271-72. "All the police had to go on," the Court explained, "was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271. Indeed, the report did not allege a crime at all; it merely reported a person's possession of a gun. *Id.*; *Watson*, 900 F.3d at 897. And because the tip "d[id] not show that the tipster had knowledge of concealed criminal activity" (*e.g.,* knowledge that J.L. was a

minor and thus not permitted to carry a gun in Florida), the tip failed to offer a reliable "assertion of illegality." *J.L.*, 529 U.S. at 272.

*J.L.* is distinguishable for several reasons. First, as noted, the assertion of illegality was clear in this case. The caller told police that he was watching Green "threaten" people with a gun. The illegality in this assertion is apparent. The caller's observations suggested that Green was committing an aggravated assault under Illinois law. Green was not accused of merely possessing a gun, he was accused of openly using it in an unlawful way. Second, the basis of the caller's knowledge of the illegality was clearly established. He was "watching" Green on the gas station's camera. The caller in *J.L.*, on the other hand, simply told police that a young Black man was carrying a gun without explaining how he knew about this. Third, whereas the anonymous tip in *J.L.* did not come through the 911 system, this one did. And while the caller *could* have used another person's phone to make the call, there is no indication that he believed the police could not trace the call back to him.[6]

Green also faults Officer Hill for failing to corroborate "key details" from the 911 call before initiating a *Terry* stop. (Def. Br., p. 9 (Doc. 48)). In his words, Officer Hill "never

---

[6] *J.L.* may also be distinguishable for a separate reason. The Seventh Circuit has embraced a "rule requiring a lower level of corroboration before conducting a stop on the basis of an emergency report." *United States v. Hicks*, 531 F.3d 555, 559 (7th Cir. 2008). This rule is "rooted in the special reliability inherent in reports of ongoing emergencies." *Id.* In such situations, *J.L.*'s requirement that police corroborate an anonymous tip before stopping a suspect "does not govern." *Id.* at 560. So, even if reliability was a closer call, the reliability framework itself is malleable when an officer responds to an ongoing emergency, as Officer Hill appears to have done here. Ultimately, whether the caller reported an ongoing emergency has no bearing on the reliability of the report. It is thus not necessary to decide whether he conveyed an ongoing emergency that might have removed the case from *J.L.*'s reach entirely. *See Swinney*, 28 F.4th at 869 (no need to determine whether anonymous 911 caller reported ongoing emergency because call was reliable under *Navarette* framework).

contacted [the] tipster . . . nor corroborated any other information aside from Mr. Green matching the clothing" attributed to him. (*Id.*, p. 10). But such corroboration was not necessary. The caller personally witnessed an ongoing crime and reported it by using the 911 emergency system.

The Seventh Circuit's decision in *Swinney* is instructive and binding on this point. There, an anonymous caller told police that a man wearing a black skullcap and a black fur coat had pulled out a large gun and walked into a liquor store. *Swinney*, 28 F.4th at 865. When police arrived, they found a man matching the caller's description, patted him down immediately, and found a gun in his coat pocket. *Id.* at 866. The court was unconvinced by the defendant's attempt to analogize *J.L.*, as Green does here. The anonymous tip, it found, "established reasonable suspicion because it reliably reported a man carrying a gun in a liquor store, which is a crime in Illinois." *Id.* at 868. "It does not matter that the police did not see [the defendant] doing anything suspicious once they arrived on the scene." *Id.* "[W]here . . . an anonymous tip reliably reports an ongoing crime, additional facts or circumstances are not required to justify a *Terry* stop." *Id.* at 869. *Swinney* compels the conclusion that Officer Hill had all he needed to stop Green: a contemporaneous eyewitness report of an ongoing crime, conveyed through the 911 system. And like the officers in *Swinney*, Officer Hill identified Green by his clothing and acted based on the report. The Court thus disagrees with Green's contention that the failure to corroborate more of the anonymous 911 caller's information warrants suppression.

## CONCLUSION

For these reasons, Green's motion to suppress (Doc. 48) is **DENIED**.


**IT IS SO ORDERED.**

**DATED: January 7, 2026**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**